# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DANIEL GUTMAN and
BENJAMIN GUTMAN,

Defendants.

Case No. 1:20-cr-00298

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SANCTIONS AND RELATED RELIEF

James M. Trusty
A. Jeff Ifrah
IFRAH LAW
1717 Pennsylvania Ave. NW
Suite 650
Washington, D.C.  20006
(202) 524-4140
(202) 524-4141 (fax)
jtrusty@ifrahlaw.com
jeff@ifrahlaw.com
*Counsel for Benjamin Gutman*

Stephen A. Miller
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 665-4736
(215) 253-6796 (fax)
samiller@cozen.com
*Counsel for Daniel Gutman*

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES .............................................................. ii

I.   INTRODUCTION ................................................................. 1

II.  BACKGROUND .................................................................. 4

    A.   Investigation, Initial Proceedings, and Plea Negotiations ............. 4

    B.   Post-Plea Discovery Requests and Document Productions ........... 9

        1.   Report of Interview of Baladna Personnel (Nov. 16, 2020) ... 11

        2.   Report of Interview of Baladna Personnel (Feb. 10, 2021) .... 12

        3.   Interview of Broker Brandon Webb (Mar. 1, 2021) ............... 13

        4.   Email from Mazen Alsbeti to Ravi Sharma (Sept. 23, 2021) . 13

III. ARGUMENT ................................................................... 15

    A.   The Government Violated the Court's Order Concerning the Disclosure
of Exculpatory Evidence ................................................. 15

    B.   The Court Should Enforce Its Order, Exclude Evidence of Baladna's
Loss, and Grant Any Additional Appropriate Relief. .................... 19

IV.  CONCLUSION ................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Harshman v. Superintendent, State Correctional Institute at Rockview*,
  368 F. Supp. 3d 776 (M.D. Pa. 2019) ..................................................21

*Lambert v. Blackwell*,
  387 F.3d 210 (3d Cir. 2004 ................................................................19

*McCann v. Mangialardi*,
  337 F.3d 782 (7th Cir. 2003) ...............................................................19

*Nat'l Assoc. of Women, Inc. v. Scheidler*,
  510 U.S. 249, 261 (1994) ....................................................................15

*United States v. Hammer*,
  404 F. Supp. 2d 676 (M.D. Pa. 2005) ..................................................21

*United States v. Liberto*,
  2021 WL 4459219 (D. Md. Sept. 29, 2021).........................................20

*United States v. Nejad*,
  2020 WL 429422 (S.D.N.Y. Sept. 16, 2020) .......................................21

*United States v. Ohiri*,
  133 F. App'x 555 (10th Cir. 2005).......................................................19

*United States v. Safavian*,
  2005 WL 3529834 (D.D.C. 2005).........................................................16

*Wilson v. Beard*,
  589 F.3d 651 (3d Cir. 2009) .................................................................19

*Young v. United States ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) .............................................................................15

## Rules

ABA Model Rules of Professional Conduct, Rule 3.8 ...........................16

Federal Rule of Criminal Procedure 5(f) ....................................... *passim*

Federal Sentencing Guidelines, § 2B1.1...................................................4

Justice Manual Sec. 9-5.001(C)(1). ................................................. 15, 16

## <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION<br>FOR SANCTIONS AND RELATED RELIEF</u>

Defendants Daniel Gutman and Benjamin Gutman, by their undersigned counsel, hereby move this Court to enforce its Rule 5(f) Order (Dkt. 16) against the United States Attorney's Office ("USAO") and impose sanctions, including suppression of evidence and any other relief this Court deems appropriate, for the prosecution's belated disclosure of exculpatory evidence in violation of due process and this Court's Rule 5(f) Order.

## I.   <u>INTRODUCTION</u>

On November 18, 2020, Defendants Daniel Gutman and Benjamin Gutman were indicted on charges that they conspired with an accredited veterinarian to sell dairy cattle to customers in Puerto Rico, Mexico, Canada, and Qatar with USDA Endorsements that were obtained through false statements to the U.S. Department of Agriculture ("USDA"). Defendants allegedly obtained the requisite USDA Endorsements based on false certifications that the veterinarian submitted to the Department for review. The certifications stated simply that the cattle had tested negative for four bovine diseases (*i.e.*, bovine tuberculosis, brucellosis, bovine leucosis, and bovine viral diarrhea) for which the cattle had not been tested. *See* Indictment (Dkt. 1). Within two weeks of the Indictment, this Court issued an Order pursuant to Federal Rule of Criminal Procedure 5(f), underscoring the Government's discovery obligations.  (Dkt. 16.) The Order directed the Government "to produce

1

material evidence in its possession custody [sic] or control favorable to the accused," including both "exculpatory evidence and information which may impeach government witnesses when that evidence is material either to guilt *or punishment*." *Id.* (emphasis added). The Order specified that the required disclosures "be made in a timely manner in order to allow the use of the exculpatory information in the defense of the case[,]" *id.* at 1, and warned that noncompliance could result in "dismissal of charges, exclusion of evidence, adverse inference jury instructions, contempt or sanctions against counsel[,]" *id.* at 1–2.

Upon entry of the Order in November 2020, the Government was obligated to produce at least four pieces of exculpatory evidence already within its possession, custody, and control—none of which the Government produced until March 31, 2022. Moreover, during the eleven months from the Defendants' indictment to their eventual guilty pleas in November 2021, Defendants repeatedly requested exculpatory evidence. Although the Government had disclosable evidence in November 2020 and acquired more throughout 2021, not a shred of it was produced to Defendants until the last week of March 2022.

All the evidence the Government withheld from Defendants is material to the issues of Defendants' guilt and punishment and should have been disclosed to Defendants pursuant to the Court's Rule 5(f) Order and the Supreme Court's holding in *Brady*.

2

The late-produced *Brady* evidence is material to sentencing because it goes to the amount of loss caused by the offense conduct. The Government's theory of loss in this case has always depended on a three-link chain: (1) Defendants sold dairy cattle that had not been tested for four specific diseases (bovine tuberculosis, brucellosis, bovine leucosis, or bovine viral diarrhea), and they did so based on their veterinarian's certification that the cows were negative for those diseases; (2) those cows, in fact, were infected with at least one of one the four diseases; and (3) the Defendants' customers suffered financial loss they would not have suffered had they not purchased the infected cows. Evidence that the cows were not infected with any of the four diseases or that they died from unrelated conditions would prove that the crime of conviction did not cause any loss to Defendants' customers.

From at least November 2020, the Government possessed evidence calling into question its theory of loss—evidence that was required to be disclosed to Defendants in a timely manner under the Court's Rule 5 Order and *Brady*. Yet, despite Defendants' repeated requests for such evidence, the Government waited until the eleventh hour to produce (i) reports of interviews with employees of one of Defendants' customers, Baladna Food Industries Co. W.L.L. ("Baladna"), stating that some of the cattle they had personally selected and purchased from Defendants died from diseases other than those at issue in this case; (ii) a report from one who brokered a sale significant to this case, stating that the customer who purchased the

livestock, lost some cattle due to mismanagement by the customer and its employees, which he witnessed firsthand; and (iii) test results showing conclusively that Defendants sold thousands of cattle that were not infected with the four diseases of interest so could not have resulted in legally relevant loss.[1]

The Government withheld exculpatory evidence from Defendants in willful violation of the Court's Rule 5 Order and its obligations under *Brady*. Defendants therefore request that this Court enforce its Rule 5(f) Order and impose sanctions against the USAO, from suppression of evidence belatedly produced to Defendants to dismissal of this case, and grant any further relief the Court deems appropriate.

## II.   BACKGROUND

### A.   Investigation, Initial Proceedings, and Plea Negotiations

Defendants own and operate a livestock business in Maryland and South-Central Pennsylvania. Indictment ¶ 1. The charges against them stem from their sales of dairy cattle from roughly 2016 to April 2020, to customers in Puerto Rico, Canada, Mexico, and Qatar, *id.* ¶¶ 15, 18.

The USDA requires cattle transported in interstate or foreign commerce to be tested for certain diseases as specified by the destination states or countries, respectively. *Id.* ¶ 5. Thus, for example, Defendants' sales to customers in Puerto

---

[1] If the Government cannot prove that bovine tuberculosis, brucellosis, bovine leucosis, and bovine viral diarrhea caused the asserted losses, its claim of loss fails. *See* U.S.S.G. 2B1.1 (cmt. 3).

Rico, Canada and Mexico required that the dairy cattle be tested bovine tuberculosis and brucellosis. Cattle exported to Qatar required the dairy cattle to be tested for bovine leucosis. *Id.*

Cattle must be transported to the destination countries with a Certificate of Veterinary Inspection (for sales within the United States and its territories, including Puerto Rico) or an endorsed International Certificate of Veterinary Inspections ("ICVI") (for sales to foreign countries, such as Canada, Mexico, and Qatar).[2] The Certificates verify that each head of cattle in a given shipment tested negative for the relevant diseases.

The Indictment alleges that, when Defendants sought to have their cattle tested for shipment to Puerto Rico, Canada, Mexico, and Qatar, Defendants enlisted the services of a USDA-accredited veterinarian named Dr. Donald Yorlets, *Id.* ¶ 20. Defendants allegedly did so knowing that Dr. Yorlets would draw blood samples from a small subset of disease-free cattle and use the blood draws to create thousands of additional samples for submission to the testing laboratory, *Id.* ¶ 15. When the tests came back negative, Dr. Yorlets issued Certificates of Veterinary Inspections

---

[2] To get the USDA's endorsement on an ICVI, the USDA-accredited veterinarian must submit the ICVI and supporting documents to the USDA for review by an Endorsement Officer. If the Officer finds the submission to be in order, the ICVI is numbered, counter-signed and embossed with a seal. Indictment ¶ 11.

and International Certificates of Veterinary Inspections stating that all of the cattle had tested negative for the diseases, when most had not been tested at all. *Id.* ¶ 16.

In November 2020, a grand jury in the Middle District of Pennsylvania returned a 25-count indictment against Defendants. *Id.* ¶¶ 15–27, 28–29, 30–31. Under Count I, Defendants were charged with conspiracy to make false statements and defraud the United States by submitting false ICVIs to the USDA for endorsement, and conspiracy to defraud their customers by falsely representing that the cattle were negative for four bovine diseases, *id.* ¶¶ 15–25, thereby inducing customers to wire roughly $7.5 million into Defendants' accounts. *Id.* ¶ 26. Defendants were charged on related counts for making false statements and wire fraud. *Id.* ¶¶ 28–31.

Within a few months of the Indictment being filed, defense counsel obtained declarations from four of the five customers named in the Indictment. Those declarations stated that each customer was satisfied with the cattle they purchased from Defendants and had not been harmed as a result of the transaction. With respect to the fifth, Baladna, Defendants obtained a statement from the former herdsman, *i.e.*, farm or cow manager, who supervised the cattle purchased from the Defendants in 2018. The herdsman stated that there was no issue with the 2018 delivery and

Baldna was satisfied with its purchase. Moreover, the herdsman did not observe any symptoms in the cattle consistent with the four diseases in question.[3]

Because loss often drives sentencing in cases of this type, the Government and Defendants' counsel started negotiating the quantum of loss last year. The Government argued that Defendants were responsible for approximately $9 million in losses to Baldna, which necessarily relied on the tacit premise that Baldna lost $9 million on cattle that exhibited conditions relating to bovine tuberculosis, brucellosis, bovine leucosis, or bovine viral diarrhea.

Counsel for Defendants had received no potentially exculpatory evidence from the Government. Defendants addressed the disadvantage by submitting to the Government specific requests for information and documents relevant to Defendants' guilt and the Government's theory of loss, which would have direct implications for Defendants' punishment.

On January 6, 2021, defense counsel transmitted to the USAO a seven-page discovery request that included specific, detailed requests for discovery related to alleged losses and alleged victims in this case. *See* Decl. of James Trusty ("Trusty

---

[3] In February 2018, Baldna purchased over 3,000 head of cattle from Brandon Webb and his company, Royal Atlantic Holdings. Due to major health issues with that shipment,  Baldna representatives selected and purchased 2,851 head from Defendants in March of 2018. Over the course of 2020, Baldna representatives selected and purchased seven shipments of cattle totaling 1,077 head. Satisfied with these purchases, Baldna paid for the cattle roughly three weeks after delivery.

Decl."), Ex. 1 (making *Brady* request for the Government to "produce any exculpatory evidence material to guilt or punishment," *id*. at 3, and "provide all recorded or documented interviews between your agents and the customers of the Gutmans[,] *id.* at 4). Defendants submitted a follow-up request in February 2021.

Later in 2021, defense counsel again requested that the USAO produce (1) records relating to Baladna's testing of cattle for the specified conditions, and (2) Baladna's and the Government's loss calculations based on cows that purportedly had at least one of the specified conditions.[4]

From June through October 2021, the Government produced no materials in response to Defendants' requests. Indeed, during the year that followed the indictment on November 18, 2020, the Government made three productions: the first two in March 2021 and the third in April 2021.   One document from those productions constitutes *Brady* material:  an April 2018 email that the Government withheld until March 2021. In that e-mail, a representative of Baladna attributed the

---

[4] During a call on June 25, 2021, defense counsel asked Assistant U.S. Attorney ("AUSA") Ravi Sharma whether Baladna had tested cows purchased from Defendants for any of these four conditions. AUSA Sharma responded, "If they have, I don't have the results."  Then, during a call on September 24, 2021, AUSA Sharma told defense counsel that he had received "preliminary test results" from Baladna showing "reactors" (*i.e.*, inconclusive results from an initial screen that require further testing) for brucellosis and tuberculosis. However, AUSA Sharma stated that Baladna did not have final results. When defense counsel requested access to Baladna's materials, the AUSA said he would follow up with Baladna.

deaths of some cows that Baladna had purchased on delayed shipments of the livestock, not on infections related to the four specified diseases. *See* RA9881. The Government produced no records of interviews and no records of Baladna's communications with the Government, including with respect to the loss amount.

While Defendants accept responsibility for their part in the underlying events, they believe the prosecution pressed them to resolve their respective plea negotiations with the Government based on incomplete information. Defendants signed their plea agreements in October 2021 and each agreed to forfeit $2.1 million before ever receiving copies of the exculpatory evidence to which they were entitled under the Court's Rule 5(f) Order, the Federal Rules, *Brady*, and the United States Constitution. The parties did not reach an agreement on loss, so they continued to discuss it in the months following Defendants' guilty pleas.

### B.   Post-Plea Discovery Requests and Document Productions

The Defendants' preparation for an evidentiary hearing on loss was virtually impossible without evidence that Baladna suffered loss as a result of cows infected with one of the four diseases at issue.  Consequently, on February 13, 2022, defense counsel transmitted to the USAO yet another discovery letter focusing on *Brady* materials and alleged loss. *See* Trusty Decl., Ex. 3. In one portion of the request letter, defense counsel referred to AUSA Sharma's reference to test results showing "reactors"—*i.e.*, inconclusive results from an initial screen that require further

testing—for brucellosis and tuberculosis and asked the USAO to "confirm that [it was] in possession of positive reactor results for brucellosis" and to produce "all test results" or to confirm when testing would be finalized. *Id.* at 2. In a separate portion of the letter, defense counsel noted that the Government had written in its "Statement of Facts" to the United States Probation Office that the cattle Baladna purchased in 2018 exhibited "a high mortality rate, a high rate of abortion, and overall bad health." *Id.* at 4. Defendants' letter (again) requested the evidentiary basis for that assertion. Defense counsel observed that Baladna handled its own shipping arrangements to Qatar and requested "full details as to the timing and cause of death for the cattle referred to" in the Government's letter to the Probation Office. *Id.*

The Government responded with document productions on March 25 and March 31, 2022, which cast the USAO's handling of this case in a new light. These productions demonstrated that the absence of *Brady* material from the Government's earlier productions was not due to the absence of such material. Instead, the March 2022 productions were replete with materially exculpatory evidence that the Government possessed as early as November 2020 and intentionally withheld during the nearly year-long negotiations before Defendants pleaded guilty. Among the productions were four key documents proving that: (1) Baladna personnel determined that cows purchased from the Defendants died from conditions (specifically, pneumonia and mycoplasma) unrelated to the four specific diseases in

question, (2) Baladna itself was responsible for health problems that its cows experienced, (3) Baladna did <u>not</u> test cows from the 2018 purchase for the four relevant diseases, (4) Baladna *did* conduct subsequent tests confirming that thousands of Defendants' cows were negative for the four diseases, and (5) Baladna cut out official USDA radio-frequency identification tags thereby eliminating USDA's ability to track the cattle.

### 1.    Report of Interview of Baladna Personnel (Nov. 16, 2020)

On March 31, 2022, the Government produced—for the first time—a memorandum summarizing a November 16, 2020 interview with various Baladna personnel (the "First Baladna Interview Memorandum"). *See* Trusty Decl., Ex. 3. This memorandum was prepared on November 17, 2020, and the Government waited more than 16 months to produce it.

The Memorandum states that Baladna personnel initially did not believe they had received diseased cattle from Defendants. Only after AUSA Kim Daniel explained to them "how their business was specifically impacted," Report at 2, did they adopt the prosecution's conclusions as their own. In addition, the memorandum describes specific health issues that Baladna observed in Gutman cattle purchased in 2020*, id.* at 3 (referring to pneumonia and mycoplasma, a bacterial infection that Defendants were not required to test for), but none were infections with one of the four relevant diseases. When defense counsel asked AUSA Sharma in early May

2022 why the Government had not produced this Memorandum sooner, he responded inexplicably that he did not view the material as exculpatory.   That response is astounding.

### 2.      Report of Interview of Baladna Personnel (Feb. 10, 2021)

On March 31, 2022, the Government produced a Memorandum of Interview summarizing another interview with Baladna personnel that occurred on February 10, 2021 (the "Second Baladna Interview Memorandum").   This memorandum was prepared on March 10, 2021; although the Government made three productions of documents in the following month, it withheld this Report for more than a year.

This Memorandum reflects the Government's ongoing discussions with Baladna concerning loss, describing a "loss calculation document[] provided by Baladna," which the Government did not disclose in its 2021 productions and still has never produced to the Defendants despite repeated requests.   Memorandum at 1. The memorandum also indicates that Baladna removes ear tags (*i.e.*, RFID devices) from incoming cattle, *id.* at 2, making it nearly impossible to determine which cows originated with Defendants (even if the company were to identify cows exhibiting any relevant infections) as opposed to other sources.   Most importantly, the memorandum states that AUSA Sharma—months after Defendants' indictment— asked Baladna personnel if they "had any sense of what disease(s) cause[d] the cows' deaths." *Id.* at 3. Baladna's herdsman stated only that he would "look into it." *Id.*

12

### 3.    Interview of Broker Brandon Webb (Mar. 1, 2021)

On March 25, 2022, the Government produced a Report of Interview summarizing an interview with Brandon Webb, who introduced Defendants to Baladna (the "Webb Interview Report"). The Government interviewed Webb on March 1, 2021 (before Defendants pleaded guilty) but did not prepare the report until February 23, 2022, and took another four weeks to produce it to Defendants on March 25, 2022.

In his interview, Webb addressed whether Defendants' crime of conviction was relevant to Baladna's asserted losses.  Webb told Government agents that he "thought that the cattle were mismanaged in Qatar" and that "the employees at the [Baladna] farm overdosed the cattle with formaldehyde and that hundreds/thousands of cattle died."  Report at 5. This exculpatory information should have been produced immediately to Defendants. The Government waited a year to hand it over.

### 4.    Email from Mazen Alsbeti to Ravi Sharma (Sept. 23, 2021)

As noted above, AUSA Sharma told defense counsel in September 2021 that he had just received "preliminary test results" from Baladna, but did not produce the results to Defendants until roughly six months later.  *See supra* pages 7–8.

On March 25, 2022, the Government produced the e-mail to which AUSA Sharma was referring—an e-mail that Baladna representative Mazen Alsbeti sent on September 23, 2021 (the "Alsbeti Email") confirming that the Gutman cattle were

negative for brucellosis and bovine tuberculosis. The e-mail included a chart with data on tests that Baladna had run since learning of the allegations against Defendants. According to the chart, Baladna tested more than 22,000 cows for brucellosis. Thirteen cows were flagged as having "reactors," but further testing showed that all were negative for brucellosis. Baladna also tested 2,000 cows for tuberculosis, identified reactors in 50 cows, all of which were subjected to further tests showing they were negative for tuberculosis.[5]

On May 4, 2022, counsel for Defendants conferred with counsel for the Government to confirm that all relevant discovery and exculpatory information had been disclosed to the defense. Government counsel confirmed that all information had indeed been disclosed.  On May 5, 2022, counsel for the Government furnished additional discovery to the defense.  Today, in discussing a matter related to this filing, counsel for the Government produced additional discovery and Brady material. The production received today, May 13, 2022, includes two interviews conducted in November 2020, both of which contain exculpatory material. The interviews were committed to a written report and finalized on May 11, 2022, almost

---

[5] Alsbeti's email also addressed test results for leucosis, showing that several Baladna cows of unknown origin had tested positive for bovine leucosis. Importantly, the negative effects of leucosis do not impact the active milk production cycles of dairy cows; those symptoms appear only after the cow has stopped dairy production and, most often, after slaughter.  In other words, the economic lifespan and value of dairy cows is unaffected by a leucosis infection. For this reason, the USDA does not require leucosis testing for domestic shipments of cattle.

two years after the interviews were conducted and a full week after counsel for the Government confirmed discovery was finally complete.

## III.   <u>ARGUMENT</u>

### A.   **The Government Violated the Court's Order Concerning the Disclosure of Exculpatory Evidence.**

By withholding *Brady* material for a prolonged period, in some cases over a year, the Government has violated this Court's November 30, 2020 Order issued under Rule 5(f) of the Federal Rules of Criminal Procedure.

Within two weeks of Defendants' indictment, this Court entered the Rule 5(f) Order explicitly confirming the Government's duty to disclose exculpatory information to the defense, and to produce material evidence in its possession, custody or control that is favorable to the defense, including exculpatory and impeachment evidence that is material to guilt or punishment. Dkt. 16 at 1. The Order requires that such evidence and information be disclosed "in a timely manner in order to allow the use of exculpatory information in the defense of the case" and warns that non-compliance may result in dismissal of the charges, exclusion of evidence, adverse jury instructions, contempt proceedings, or sanctions against counsel. *Id.* at 1–2.

The United States Attorneys' Manual (the "Justice Manual") imposes the same obligations on federal prosecutors.[6] Indeed, section 9-5.001(C)(1) requires prosecutors to disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, *regardless of whether the prosecutor believes such information will make the difference* between conviction and acquittal of the defendant for a charged crime." Justice Manual Sec. 9-5.001(C)(1) (emphasis added). Such "[e]xculpatory information must be disclosed reasonably promptly after it is discovered." *Id.* § 9-5.001(D)(1); *see also* ABA Model Rules of Professional Conduct, Rule 3.8.

Pre-trial (as opposed to post-trial), the threshold for disclosure is relatively low. *Brady* requires disclosure of evidence that is potentially exculpatory or otherwise favorable without regard to how the withholding of such evidence might be viewed with the benefit of hindsight as affecting the outcome of the trial. *See United States v. Safavian*, Crim. No. 05-0370 PLF, 2005 WL 3529834 at *16–17 (D.D.C. 2005) (holding that, in trial court, prosecution must disclose potentially exculpatory or otherwise favorable evidence without regard to how the withholding

---

[6] The U.S. Supreme Court has cited the Justice Manual as setting forth the authoritative standards to which federal prosecutors are held. *See, e.g.*, *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801-02 (1987) (citing Justice Manual provisions as establishing the basis for conduct courts can "reasonably expect" from prosecutors); *Nat'l Assoc. of Women, Inc. v. Scheidler*, 510 U.S. 249, 261 (1994) (citing Justice Manual guidelines as informing the Court's interpretation of the Racketeer Influenced and Corrupt Organizations Act).

of such evidence might be viewed with the benefit of hindsight as affecting the outcome of the trial).

The facts stated herein show that the Government has possessed *Brady* evidence since at least November 2020, but did not disclose or produce any of it to Defendants until March 2022.

The First Baladna Interview Memorandum is plainly exculpatory insofar as it shows that Baladna (i) could not have been injured as a result of Gutman cattle that Baladna's tests showed were negative for brucellosis and bovine tuberculosis; (ii) did not find bovine tuberculosis, brucellosis, or bovine viral diarrhea in any livestock purchased from Defendants; and (iii) identified pneumonia and mycoplasma in cattle purchased from Defendants, neither of which pertains to the four specific diseases relevant to this case and neither of which is subject to required testing. When defense counsel asked AUSA Sharma in early May 2022 why the Government had not produced this Memorandum sooner, he said he did not think it was exculpatory.

The Second Baladna Interview Memorandum is likewise exculpatory, as it demonstrates that Baladna asserted loss based on cattle deaths despite the lack of evidence showing that any of them was caused by one of the four specific diseases. It also shows that Baladna's practice of removing RFID tags from the cows makes it impossible for the company to link any diseased or deceased cows with purchases

from Defendants. These facts undermine the Government's ability to prove that Defendants' crime of conviction caused the inflated losses Baladna now claims. In the face of Defendants' repeated requests for these reports, the Government waited a year to produce it.

The Webb Interview Report also constitutes materially exculpatory evidence, as it expresses the view of a third party involved with Baladna's 2018 purchase that Baladna's conduct caused health issues among the cattle purchased from Defendants. The memorandum also provides support for concluding that the cattle were harmed by shipping conditions, not any of the four relevant diseases. Webb told the Government that the mortalities that Baladna (and the Government) attribute to Defendants' false statements stem from other causes and therefore cannot contribute to the loss amount in this case. The Government possessed this evidence since March 1, 2021 and failed to produce it until March 25, 2022.

Finally, the Alsbeti Email is replete with exculpatory *Brady* material. The test results conveyed in the Alsbeti Email demonstrate that Baladna tested its cattle for brucellosis and tuberculosis and did not identify any positive cases of either. No doubt, the Government was aware of the email's contents: AUSA Sharma referred to it in his conversation with defense counsel the very next day. Nevertheless, the Government did not produce the substantive information for more than six months— long after Defendants had signed their plea agreements.

18

**B.      The Court Should Enforce Its Order, Exclude Evidence of Baladna's Loss, and Grant Any Additional Appropriate Relief.**

Out of five customers that could have suffered loss from Defendants' crime of conviction, the Government alleges loss as to one: Baladna. The other customers expressed satisfaction with their cattle purchases and predicted they will buy from Defendants again. Baladna is the only customer who has claimed a loss, and it did so only after Defendants were indicted and the Government "explain[ed]" how Baladna's business had been impacted.

Baladna is the Government's last and only hope to conjure *some* loss attributable to Defendants' crime.  Perhaps for this reason, the Government has long withheld information on its calculation of Baladna's loss.  Indeed, after Defendants repeatedly requested these kinds of materials, the Government said they did not exist.  In light of this violation of the Court's Order, Defendants request that the Court exclude evidence concerning Baladna's alleged losses and any further relief the Court deems appropriate.

Multiple appellate courts have held that the Government must disclose material exculpatory information prior to the entry of guilty pleas. *See, e.g.*, *Wilson v. Beard*, 589 F.3d 651 (3d Cir. 2009); *Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004); *McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003); *United States v. Ohri*, 133 F. App'x 555 (10th Cir. 2005). Such is the case whether courts locate a criminal defendant's right to exculpatory evidence in the Fifth Amendment's Due Process

19

Clause, judicial precedent, or a Rule 5(f) order,[7] which (in this case) expressly contemplates a range of remedies, including "dismissal of charges, exclusion of evidence, adverse jury instructions, contempt proceedings or sanctions against counsel." Dkt. 16 at 1-2.

In response to a *Brady* violation or Rule 5(f) violation, this Court may order the suppression of evidence to remedy the Government's belated disclosure of exculpatory information. For example, in *United States v. Liberto*, No. 1:19-cr-00600, 2021 WL 4459219 (D. Md. Sept. 29, 2021), the defense sought relief for the prosecution's failure to disclose an exculpatory witness interview until years after the defendant was indicted. The court observed, "Since the documents are favorable to the Defendant, material to his defense, and were in the possession of the Government, they constitute *Brady* material and their belated disclosure is unacceptable to this Court." *Id.* at *8. The court then granted defendant's sanctions motion and ordered that the Government could not call as a trial witness, the person whose interview was not disclosed and ordered that the Government could not introduce material that it belatedly produced. *Id.*

---

[7] The new Rule 5(f) was instituted by the Due Process Protections Act of 2020, Pub. L. No. 116-182, 134 Stat. 894, which was signed into law in October 2020, only one month before this Court issued its Order. Although Rule 5(f) is a recent addition to the Federal Rules, this Court can draw on prior rulings in analogous contexts in fashioning relief for the Government's belated disclosure of *Brady* material.

*Liberto* is analogous to the present matter. As in that case, the Government possessed documents that were favorable to Defendants and material to the issue of loss. Just as the *Liberto* court characterized the Government's withholding of materially exculpatory evidence for a prolonged period as "unacceptable," this Court should not countenance the Government's withholding of similar evidence here. And just as the *Liberto* Court excluded the belatedly produced evidence and barred the Government from calling the relevant witness, this Court should order that the Government is not allowed to proffer evidence on Baladna's alleged loss. *See also Harshman v. Superintendent, State Corr. Inst. at Rockview*, 368 F. Supp. 3d 776 (M.D. Pa. 2019) (ordering that state-court conviction be vacated due prosecution's failure to disclose information on the favorable treatment provided to key trial witness); *United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005) (vacating and order re-trial of penalty phase of capital murder case where Government failed to disclose exculpatory evidence); *United States v. Nejad*, No. 18-cr-00224, 2020 WL 429422 (S.D.N.Y. Sept. 16, 2020) (granting federal prosecutors' request to dismiss conviction to remedy their failure to turn over exculpatory evidence and stating as follows in its written order: "The Government in this case has failed to live up to the[] ideals [of the U.S. justice system]. . . . The cost of such Government misconduct is high. With each misstep, the public faith in the criminal-justice system further erodes.  With each document wrongfully withheld, an innocent person faces

the chance of wrongful conviction.  And with each unforced Government error, the likelihood grows that a reviewing court will be forced to reverse a conviction or even dismiss an indictment, resulting in wasted resources, delayed justice, and individuals guilty of crimes potentially going unpunished." (*id.* at 33–34)).

In accordance with the above-cited cases, Defendants ask the Court to find that the Government has violated its duty to disclose favorable information and produce exculpatory evidence in this case and to order that the Government may not introduce evidence concerning Baladna's alleged loss.  The Government mischaracterized this evidence for months—including the very existence of it—and only disclosed plainly exculpatory documents more than 16 months after Defendants were indicted (and on the eve of a hearing with the Court after defense counsel raised the issue in a meet-and-confer). In light of the Court's explicit instruction that the Government disclose exculpatory evidence in a timely manner, Defendant's request that the Court award sanctions, including suppression of evidence up to and including dismissal of the entire case.

IV.   **CONCLUSION**

For the foregoing reasons, Defendants request that this Court enforce its Rule 5(f) Order, impose sanctions against the USAO, and grant any further relief the Court deems appropriate.

Dated: May 13 2022                                  Respectfully Submitted,

_/s/ James M. Trusty_
James M. Trusty
A. Jeff Ifrah
IFRAH LAW
1717 Pennsylvania Ave. NW
Suite 650
Washington, D.C.  20006
(202) 524-4140
(202) 524-4141 (fax)
jtrusty@ifrahlaw.com
jeff@ifrahlaw.com
_Counsel for Benjamin Gutman_

_/s/ Stephen A. Miller_
Stephen A. Miller
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 665-4736
(215) 253-6796 (fax)
samiller@cozen.com
_Counsel for Daniel Gutman_

23

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Defendants, James M. Trusty and Stephen A. Miller, hereby certify that service of a copy of the foregoing Defendants' Memorandum in Support of Their Motion for Sanctions was effectuated on May 13, 2022, upon counsel of record via the Court's electronic filing system.

Dated: May 13, 2022                    Respectfully Submitted,

*/s/ James M. Trusty*
James M. Trusty
IFRAH PLLC
1717 Pennsylvania Ave. NW
Suite 650
Washington, D.C.  20006
(202) 524-4140
(202) 524-4141 (fax)
jtrusty@ifrahlaw.com
*Counsel for Defendant Benjamin*
*Gutman*

24